<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANTONIO MORONI, <br><br> Plaintiff, <br><br> v. <br><br> PENWEST PHARMACEITICALS CO., ET AL. <br><br> Defendants. | Civ. No.  07-5546 (DRD) <br><br> **O P I N I O N** |

*Appearances by:*

SCIARRA & CANTRAMBONE, LLC
by: Jeffrey D. Cantrambone, Esq.
1130 Clifton Avenue, Suite 3
Clifton, NJ 07013

    *Attorneys for Plaintiff*

ROBINSON & COLE, LLP
by: David J. Burke, Esq. and Robin P. Keller, Esq.
1055 Washington Boulevard
Stamford, CT 06904

    *Attorneys for Defendant, Penwest Pharmaceuticals Company*

**<u>DEBEVOISE, Senior District Judge</u>**

    This matter comes before the Court on a Motion for Summary Judgment submitted by Defendant, Penwest Pharmaceuticals Company ("Penwest").  Plaintiff Antonio Moroni, a former Penwest employee, filed a Complaint on November 16, 2007 alleging that his termination by the company was motivated by his age and national origin, and asserting claims under the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000a et seq. Penwest contends that Mr. Moroni waived those claims by signing a release at the time of his termination. In the alternative, the company argues that there was a non-discriminatory basis for Mr. Moroni's termination, which he has not demonstrated to be pretextual. For the reasons set forth below, the Court agrees with Penwest's contention that Mr. Moroni released his claims, and will grant the company's Motion for Summary Judgment. Because Mr. Moroni's claims are barred by the release, the Court need not address their merits or the question of whether Penwest has advanced a valid, non-discriminatory rationale for his termination.

## I.  BACKGROUND

Mr. Moroni, who was born in Italy in 1953 and immigrated to the United States thirty years later, is an accomplished scientist who holds a doctorate degree in Chemistry. He was hired by Penwest on September 30, 2002 as Director of their Research and New Technology Development Department. Prior to his employment with Penwest, he held positions at a number of other pharmaceutical companies.

On January 23, 2007, Penwest informed Mr. Moroni that he would be terminated, effective immediately. It appears that Mr. Moroni performed his duties at Penwest capably, and the company does not contend that he was terminated as the result of any misconduct or incompetence. To the contrary, Penwest claims that Mr. Moroni was fired because his duties – which included supervising various scientific work and reviewing patents – were no longer needed in light of the company's changing business focus and decision to hire a new attorney with experience in intellectual property law.

During the meeting with Penwest's Human Resources Director at which he was informed of his termination, Mr. Moroni was furnished with a "Severance and Settlement Agreement and Release" (the "Separation Agreement"). In the same meeting, he was informed that he would have 21 days to consider the release before being required to make a decision. Additionally, Mr. Moroni acknowledges that he was told that he should seek the advice of an attorney before signing the agreement. (Def.'s Statement of Facts at 47-48 ¶ 86) ("Mr. Moroni was also advised of his right to consult an attorney before signing the agreement.") (citing (Donohue Aff. of July 10, 2008 ¶ 87) (same)); (Pl.'s Statement of Facts at 42 ¶ 86) (stating that the corresponding allegation in Penwest's Statement of Undisputed Material Facts is "admitted.").

The Separation Agreement stated that Mr. Moroni, in exchange for severance payments, waived any legal claims he might have against Penwest. The portion of the agreement containing that waiver, which was titled "<u>Release</u>," specifically referred to claims under the ADEA and Title VII, stating in relevant part that:

> The Employee hereby fully, forever, irrevocably and unconditionally releases, remises and discharges the Company … from any and all claims, charges, complaints, demands, actions, causes of action, suits … and expenses (including attorneys' fees and costs), of every kind and nature which he ever had or now has against the Company … arising out of h[is] employment with or separation from the Company including, but not limited to, all employment discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u>, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, <u>et seq.</u>

(Def.'s Br. Supp. Mot. Summ. J., Ex. I ¶ 3.)

Another section of the Separation Agreement included "<u>Acknowledgments</u>." It stated that:

> The Employee acknowledges that he has been given twenty-one (21) days to consider this Agreement and that the Company advised him to consult with an attorney of him [sic] choosing prior to signing this Agreement. The Employee may revoke this Agreement for a period of seven (7) days after the execution of

> this Agreement, and the Agreement shall not be effective or enforceable until the expiration of this seven (7) day revocation period.

(Id. ¶ 12.)

Another section of the agreement, titled "Voluntary Assent," also made reference to Mr. Moroni's right to consult an attorney by stating that "[t]he Employee states and represents that he has had an opportunity to fully discuss and review the terms of this Agreement with an attorney." (Id. ¶ 13.)

The severance provision contained in the Separation Agreement outlined the consideration for Mr. Moroni's decision to waive any claims he might have had against Penwest, stating:

> Monetary Consideration. In return for the execution of the instant Severance and Settlement Agreement and Release, the Company agrees to continue to pay the Employee's salary for Two (2) months from the termination date (the "Severance Period") for a gross amount of Twenty-Two Thousand, Nine Hundred Seventy Dollars and Thirty-Five cents ($22,970.35), less all applicable state and federal taxes as severance pay…

(Def.'s Br. Supp. Summ. J., Ex. I ¶ 2.)

In addition to severance payments, the Separation Agreement stated that Penwest would continue to pay its share of Mr. Moroni's health and dental coverage during the severance period. (Id.)

The day after his termination, Mr. Moroni met with Penwest's Chief Financial Officer to discuss the Separation Agreement. During that meeting, he convinced her that the company should add an additional four weeks of pay to his severance benefits. To that end, a provision was added to the agreement stating that "[a]t the end of the Severance Period, if the Employee remains unemployed after the Employee has made diligent efforts to find another employment, the Company agrees to extend the Severance Period for an additional week at a time for a maximum period of four (4) weeks." (Def.'s Br. Supp. Mot. Summ. J., Ex. I ¶ 2) compare with

4

(Def.'s Br. Supp. Mot. Summ. J., Ex. H ¶ 2) (earlier draft of the Separation Agreement in which the provision was not included).

On January 30, 2007, Mr. Moroni executed the Separation Agreement. Penwest performed on the contract by issuing severance payments over the following two months and continuing to subsidize Mr. Moroni's health and dental insurance. When Mr. Moroni informed Penwest at the end of the initial two-month severance period that he had not been able to secure employment, the company extended its payments for four weeks as provided for in the Separation Agreement.

On July 19, 2007 – almost seven months after executing the Separation Agreement – Mr. Moroni filed a Complaint with the Equal Opportunity Employment Commission ("EEOC") alleging that Penwest had terminated him based on his age and/or Italian nationality in violation of the ADEA and Title VII. The EEOC on August 24th of that year issued a "Right to Sue" letter in which it advanced no opinion on the merits of Mr. Moroni's claims, but stated that it would be unable to process those charges within the requisite 180-day period and the suit should therefore proceed to federal court.

Mr. Moroni filed a two-count Complaint in this Court asserting claims against Penwest under the ADEA and Title VII on November 16, 2007. In support of the former claim, Mr. Moroni alleged that he was replaced by younger individuals who assumed his duties at the company. The Complaint stated in a conclusory fashion that "Mr. Moroni was discriminated against as a result of his immigrant Italian heritage in violation of Title VII," but contained no allegations relating to specific instances of such discrimination or whether other Italian-American workers at the company had suffered similar indignities. (Compl. ¶ 19.) The Complaint did, however, include contentions in relating to whether Mr. Moroni had waived his

5

claims by executing the Separation Agreement, stating "Penwest provided Mr. Moroni with an inadequate time frame by which to accept or reject the severance offer, thereby placing him under considerable duress." (Compl. ¶ 10.) Later in the Complaint, Mr. Moroni elaborated on that argument by claiming that he:

> [W]as not provided with … any meaningful opportunity to review the agreement or consult with an attorney, regardless of the terms of the agreement, given the substantial financial strain under which Mr. Moroni was placed which compelled him to sign the agreement approximately one (1) week after being presented with it. Hence, any such purported severance agreement is null and void, has been revoked by Moroni, and is unenforceable.

(Compl. ¶ 11.)

## II. DISCUSSION

In the pending motion, Penwest contends that Mr. Moroni waived his right to bring claims under the ADEA and Title VII claims by executing the Separation Agreement, and that his suit must therefore be dismissed. In the alternative, the company asserts that Mr. Moroni's must fail on the merits. That argument is based on Penwest's contention that Mr. Moroni's termination was not motivated by discriminatory factors such as his age or national origin, but rather was the result of changes to the company's business model that rendered his services unnecessary.

Mr. Moroni argues that he did not waive his Title VII and ADEA claims by executing the Separation Agreement for two reasons. First, he claims that, although the company ostensibly gave him 21 days to consider the release before signing, he was prevented from doing so by Penwest's refusal to continue paying his salary during that period. Additionally, Mr. Moroni asserts that the language contained in the Separation Agreement was legally insufficient to meet the OWBPA's requirement that he be advised to consult an attorney before releasing his ADEA claims or the corresponding criteria under the "totality of the circumstances" test applicable to

6

Title VII actions. For the reasons set forth below, the Court rejects those arguments, and finds that Mr. Moroni's release of claims was effective under both the OWBPA and "totality of the circumstances" test. In light of that finding, the merits of Mr. Moroni's claims need not be addressed.

**A. Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal

Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B. Release of Claims**

An employee may waive his or her claims under Title VII and the ADEA as part of a voluntary settlement agreement. Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 (1974) (Title VII claims); Coventry v. U.S. Steel Corp., 856 F.2d 514, 521 n.8 (3d Cir. 1988) (ADEA claims). Any such waiver must be knowing and voluntary. Alexander, 415 U.S. at 52 n.15; Coventry, 856 F.2d at 521. In a suit alleging that a waiver was ineffective, the employer bears the burden of establishing that the release of rights was both knowing and voluntary. 29 U.S.C. § 626(f)(3) ("In any dispute that may arise over" the validity of an ADEA waiver, "the party asserting the validity of [the] waiver shall have the burden of proving … that it was knowing and voluntary."); Livingstone v. N. Belle Vernon Borough, 12 F.3d 1205, 1211 (3d Cir. 1993) (In an action involving a waiver of Title VII claims, "[t]he burden of proof is upon the party relying on the release.").

The OWPBA codifies several factors that must be satisfied in order for a waiver of ADEA claims to be effective. Those relevant to this case include whether:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under [the ADEA];
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

8

>(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
>(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
>(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; and
>
>…
>
>(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired.

29 U.S.C. § 626(f)(1).

Although the standards for assessing the validity of agreements waiving Title VII claims have not been codified, they implicate similar concerns. <u>Coventry</u>, 856 F.2d at 522 ("Our test to determine whether or not the release of ADEA claims is valid is grounded in the analysis that has been applied to claims arising under Title VII.") The Court must consider the "totality of the circumstances" under which the waiver was entered into, including:

>(1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether Plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

<u>Long v. Sears Roebuck & Co.</u>, 105 F.3d 1529, 1538 (3d Cir. 1997).

Viewed in light of those considerations, the facts at issue in this case reveal that Mr. Moroni knowingly and voluntarily agreed to the waiver contained in the Separation Agreement.

9

The waiver provision was drafted in clear and specific language, and Mr. Moroni – an accomplished scientist who holds a doctorate degree in chemistry – was capable of understanding its terms. 29 U.S.C. § 626(f)(1)(A) (outlining requirement that a waiver of ADEA claims be "part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual" in light of his or her education and experience); Long, 105 F.3d at 1538 (stating similar requirement for Title VII claims). Notably, Mr. Moroni brought a similar action against the company for whom he worked prior to Penwest. He was represented by the same counsel in that case as in the present litigation, and asserted claims under the ADEA and Title VII. In the prior case, as here, Mr. Moroni had signed a release of those claims, which he contended was invalid under the OWPBA and "totality of the circumstances" test. The similarities between that suit and the present action are not, in and of themselves, necessarily evidence that the merits of his claims in this case are deficient. They do, however, lend support to the Court's holding that he was capable of understanding the terms of the release contained in the Separation Agreement and was aware of the fact that his execution of that document would bar future claims under the ADEA and Title VII.

In addition to using clear and specific language that was capable of being understood, the release referred to both the ADEA and Title VII by name, and included citations to the sections of the United States Code where both statutes could be found. 29 U.S.C. § 626(f)(1)(B). It specifically limited the claims released to those "which he ever had or now has," and thus did not include causes of action that may have arisen after its execution. See 29 U.S.C. § 626(f)(1)(C). In exchange for the release, Mr. Moroni accepted severance payments of $22,970.35, along with continued COBRA health and dental insurance benefits, to which he would not otherwise have been entitled. See 29 U.S.C. § 626(f)(1)(D); Long, 105 F.3d at 1538 (factor number seven).

Moreover, there is no dispute that Mr. Moroni had the right to revoke the Separation Agreement within seven days of its execution, but did not attempt to do so.  In fact, the release drew its revocation provision directly from the corresponding portion of the ADEA, stating that "[t]he Employee may revoke this Agreement for a period of seven (7) days after the execution of this Agreement, and the Agreement shall not be effective or enforceable until the expiration of this seven (7) day revocation period."  (Def.'s Br. Supp. Summ. J., Ex. I ¶ 12.) compare with 29 U.S.C. § 626(f)(1)(G).  Mr. Moroni admitted in his deposition testimony that he understood the revocation clause.  (Def.'s Br. Supp. Mot. Summ. J., Ex. C at 43:16-21.)

Mr. Moroni was given ample opportunity to negotiate with Penwest regarding the terms of the release – an opportunity of which he took full advantage.  An initial draft of the Separation Agreement called for Mr. Moroni's severance payments to terminate after two months.  On January 24, 2007, two days after he was terminated and given a draft of the Separation Agreement, Mr. Moroni met with Penwest's Chief Financial Officer and convinced her to add a provision requiring the company to pay an additional four weeks of benefits in the event that he did not secure employment within two months.  That understanding was memorialized in provision that was added to the final Separation Agreement, which stated that "At the end of the Severance Period, if the Employee remains unemployed after the Employee has made diligent efforts to find another employment, the Company agrees to extend the Severance Period for an additional week at a time for a maximum period of four (4) weeks."  (Def.'s Br. Supp. Mot. Summ. J., Ex. I ¶ 2) compare with (Def.'s Br. Supp. Mot. Summ. J., Ex. H ¶ 2.)  Thus, it appears that Mr. Moroni actively negotiated the terms of the Separation Agreement, and understood those terms, at least with regard to the amount of severance pay he would receive.

There are two grounds on which Mr. Moroni bases his argument that the release of his ADEA and Title VII claims contained in the Separation Agreement was not valid. First, he contends that he was not given 21 days to consider the waiver, as required by 29 U.S.C. § 626(f)(1)(F)(i). Additionally, Mr. Moroni claims that the language contained in the Separation Agreement advising him to consult an attorney before executing the release was not sufficient to satisfy the OWBPA's requirement that he be informed in writing of his right to counsel before releasing his ADEA claims or the corresponding criterion applicable with respect to Title VII actions. See 29 U.S.C. § 626(f)(1)(E) (An employee must "be advised in writing to consult with an attorney prior to executing the agreement."); Long, 105 F.3d at 1538 (stating as relevant concern "whether plaintiff was encouraged to seek, or in fact received benefit of counsel.").

### i.     *Opportunity to Consider the Release*

Mr. Moroni's argument that he was not given sufficient time to consider the release is unavailing. Penwest assured Mr. Moroni that he would be allowed to consider the Separation Agreement for 21 days before making a decision. Mr. Moroni contends, though, that the company's failure to continue paying his salary during that time effectively forced him to execute the release after just one week. That argument is, essentially, a claim that the Court should invalidate Mr. Moroni's accession to the Separation Agreement on the grounds that he was under economic duress. Under New York law, which governs the Separation Agreement, "[a] contract may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will." Sitar v. Sitar, 878 N.Y.S.2d 377, 380 (N.Y. App. Div. 2009) (quoting Stewart M. Muller Constr. Co., Inc. v. N.Y. Tel. Co., 359 N.E.2d 328 (N.Y. 1976). Mr. Moroni has presented no evidence that Penwest made such a "wrongful threat." To the contrary, his duress

12

claim is premised on the company's refusal to continue paying his wages during the 21-day period after his termination. Nothing in the ADEA requires an employer to continue to pay a terminated employee during that consideration period. See 29 U.S.C. § 626(f)(1). While it may be true that Mr. Moroni was in a disadvantaged position during the negotiation of the Separate Agreement due to his personal financial needs, "the existence of financial pressure and an unequal bargaining position are insufficient to constitute economic duress." Edison Stone Corp. v. 42nd St. Dev. Corp., 538 N.Y.S.2d 249, 256 (N.Y. App. Div. 1991). Therefore, the Court finds that the ADEA's requirement that Mr. Moroni be given 21 days to consider the Separation Agreement was satisfied.[1]  See 29 U.S.C. § 626(f)(1)(F)(i); see also Long, 105 F.3d at 1538 (including as a relevant consideration in determining the validity of a release of Title VII claims "the amount of time plaintiff had for deliberation about the release before signing it.").

### ii. *Did the Separation Agreement Adequately Advise Mr. Moroni to Seek Counsel?*

Mr. Moroni also contends that the language used in the Separation Agreement did not meet the requirement of 29 U.S.C. § 626(f)(1)(E) that he be "advised in writing to consult with an attorney prior to executing the agreement." In support of that argument, he relies heavily on the holding by the United States District Court for the District of Delaware in Cole v. Gaming Entertainment, LLC, 199 F. Supp.2d 208, 214 (D.Del. 2002), that a release which "d[id] not use any verbs of command or direction to caution, warn, or recommend that the employee consult an attorney" was "insufficient to satisfy the voluntariness requirement" of the ADEA. The provision of the release aimed at advising the plaintiff in that case that he should consult counsel was similar to the one in Mr. Moroni's Separation Agreement. It stated that "[e]mployee

---

[1] The fact that Mr. Moroni signed the Separation Agreement prior to the expiration of the 21-day consideration period is of no importance. See Lloyd v. Brunswick Corp., 180 F.3d 893, 895 (7th Cir. 1999) (ADEA release requirements met where plaintiff signed the release "on the spot" even though he was given more time).

13

acknowledges that he/she has been advised to consult with an attorney prior to executing this Agreement." Id. The Court took issue with the verb tense used in that provision, stating, "the release uses passive language that requires the employee to infer the right to discuss the release with an attorney. Asking the employee to make such an inference is insufficient under current case law." Id.

In support of its ruling that passive language is insufficient to advise a plaintiff of his or her right to consult an attorney before releasing ADEA claims, the Court in Cole relied on the First Circuit's ruling in another case, American Airlines v. Cardoza-Rodriguez, 133 F.3d 111 (1st Cir. 1998). The Court in Cole claimed that the First Circuit had:

> [N]ot[ed] that [a] release did not "specifically advise the employees to consult with an attorney prior to executing the release" for OWBPA purposes where it merely stated "I have had reasonable and sufficient time and opportunity to consult with an independent legal representative of my own choosing before signing this Complete Release of All Claims."

Cole, 199 F. Supp.2d at 214 (internal quotations omitted).

This Court disagrees with Cole's characterization of the First Circuit's ruling in American Airlines. There were two agreements at issue in that case. The first was a Voluntary Early Retirement Program ("VERP") Election Form stating that the employee wished to participate in that program. The VERP Election Form stated that, on an employee's last day of work, he or she would be required to sign a second document – the "Complete Release of All Claims" ("the release"), which "absolve[ed] American of all employment-related liability including, specifically, 'age discrimination claims.'" Am. Airlines, 133 F.3d at 114. "The earliest election occurred on October 11, 1994, the latest on December 13, 1994." Id. The earliest termination, though, did not occur until December 30, 1994, and the latest did not take place until September 29, 1995. Id. Thus, it was possible that an employee might continue

14

working at American for up to 11 months between signing the VERP Election Form – which required that he or she would waive all claims at the time of departure – and executing the release by which that waiver became effective.

In holding that the employees' waiver of their ADEA claims in American Airlines was invalid, the First Circuit took issue not with the provision of the release quoted in Cole, but rather with the fact that the employees were required to agree to sign that release by the VERP Election Form, which "said nothing about seeking independent legal advice prior to making the election to retire and agreeing to execute the release as the statute dictates." Id. at 118. The Court noted the chronological gap between the time at which the employees agreed to waive their claims by signing the VERP Election form and the time they were advised in writing of their right to consult counsel by the release, stating that "[a]lthough each employee acknowledged on the VERP [E]lection [F]orm having read the release before making his or her election, the only reference to consulting legal counsel appears in the release itself, which was not to be executed until the employee actually left work a number of months later." Id. (emphasis added). Later in its Opinion, the First Circuit reiterated the fact that its ruling was based on that chronological gap, stating that "[b]ecause American failed to directly advise their employees to consult a lawyer before making the election, we rule, as a matter of law, that American failed to meet its burden under the OWBPA." Id. (emphasis added). Thus, the District of Delaware's contention in Cole that the waiver in American Airlines was invalid because it used passive language rather than active or commanding verbs is based on a misunderstanding of the factual context of that case.

In light of the fact that American Airlines does not support the ruling in Cole, this Court declines to find that the language used in the release signed by Mr. Moroni was invalid based on

15

the fact that it used passive language. The OWBPA requires that an employee be "advised in writing to consult with an attorney." 29 U.S.C. § 626(f)(1)(E). It does not mandate that an employer couch that advice in commanding or encouraging terms, or that employers refrain from using the passive voice when drafting settlement agreements. In the absence of a Congressional imposition of such requirements, this Court will refrain from adding them to the statute. That refusal is consistent with earlier decisions in this Circuit. See Cirillo v. Arco Chem. Co., 862 F.2d 488, 453 (3d Cir. 1988)[2] (upholding the validity of a release using permissive language to advise employee of his right to counsel by stating that "[y]ou may also want to discuss the following release language with your lawyer.").

Even if this Court were to follow the ruling in Cole, Mr. Moroni's release of his Title VII and ADEA claims would be effective. The District of Delaware noted in Cole, 199 F. Supp. at 214, that "the release language might have met the OWBPA and Title VII standards if" the employee had been orally informed that he had the right to consult an attorney, but the defendant in that case "d[id] not dispute that Cole was never orally advised of his right to have an attorney review the release." In contrast, Mr. Moroni admits that he was advised orally in his meeting with Penwest's Human Resources Director to seek counsel before signing the Separation Agreement. See (Def.'s Statement of Facts at 47-48 ¶ 86) ("Mr. Moroni was also advised of his right to consult an attorney before signing the agreement.") (citing (Donohue Aff. of July 10, 2008 ¶ 87) (same)); (Pl.'s Statement of Facts at 42 ¶ 86) (stating that the corresponding allegation in Penwest's Statement of Undisputed Material Facts is "admitted."). In light of that

---

[2] As noted by the Court of Appeals in Long, 105 F.3d at 1538-39, the decision in Cirillo utilized the "totality of the circumstances" test for determining whether the waiver in that case was knowing and voluntary. That test was previously applicable to ADEA claims, but was superseded by the enactment of the OWBPA. The "totality of the circumstances" test remains the relevant inquiry for Title VII claims. Cirillo's holding that the language in the release at issue in that case was effective in advising the employee of his right to consult an attorney was not affected by the passage of the OWBPA, and remains good law.

admission, the Court finds that Mr. Moroni was not required to make an inference from the language of the Separation Agreement that he was entitled to an attorney; he was made aware of that entitlement prior to executing the release, and the language contained in the Separation Agreement was simply an acknowledgment that the company had informed him of his rights. Therefore, the Court finds that Mr. Moroni waived his ADEA and Title VII claims, and that waiver was sufficient to meet the requirements of both the OWBPA and the "totality of the circumstances" test.

### III.  CONCLUSION

For the foregoing reasons, Penwest's Motion for Summary Judgment is granted, and Mr. Moroni's ADEA and Title VII claims are dismissed.

The Court will enter an Order implementing this Opinion.

                                           **s/ Dickinson R. Debevoise**
                                           DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: October 9, 2009